# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### July 19, 2012 Session

## GEORGE EDWARDS v. ALICE EDWARDS

**An Appeal from the Chancery Court for Dyer County**
**No. 10-CV-377     Tony Childress, Chancellor**

---

**No. W2011-02305-COA-R3-CV - Filed December 12, 2012**

---

This is a divorce case in which the husband challenges the award of alimony. After the divorce trial, the trial court awarded the wife transitional alimony and alimony *in futuro*. It also awarded the wife a monetary amount per month for her share of the husband's military pension benefits. The husband filed a motion to alter or amend arguing *inter alia* that the military would not make direct payments to the wife from his military benefits because the marriage did not overlap the husband's active-duty military service for the requisite number of years. Based on the husband's argument, the trial court modified the alimony award by deleting the requirement that the husband divide his military pension benefits with the wife, but increasing the husband's *in futuro* alimony obligation by an equal amount. The husband now appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Charles S. Kelly, Jr., Dyersburg, Tennessee, for the Plaintiff/Appellant George Edwards[1]

Milly Worley, Dyersburg, Tennessee, for the Defendant/Appellee Alice Edwards

---

[1]Mr. Kelly did not represent Husband at trial. He began representing Husband when he filed his motion to alter or amend the trial court's judgment.

# OPINION

Plaintiff/Appellant George Edwards ("Husband") and Defendant/Appellee Alice Edwards ("Wife") were married on April 7, 1991. When the parties married, Husband was 36 years old and Wife was 39 years old.[2]

Husband joined the military right out of high school. He served in the military a total of 22 years. Husband attended Murray State University and received an associate's degree in design technology. Wife earned a bachelor's degree in health information management, and while Husband was stationed in Japan, she obtained a master's degree in public administration. The parties moved with some frequency while Husband was serving in the military. Wife held a variety of jobs in these locations, mostly in the medical records department at a hospital or medical center in the locale. After Husband retired from the military, the parties eventually moved to Dyersburg, Tennessee, and purchased a home there.

The marriage came to a screeching halt after an incident on July 26, 2010 that Husband characterizes as "a misunderstanding by my wife." On that night, Wife returned to the marital home after a weekend visit with her sister in Nashville. When she arrived home at about 8:30 p.m., she found Husband in the parties' kitchen in his pajama pants and a t-shirt. She also found a woman sitting on the parties' couch in the den, wearing only a pink negligee[3] and a "shawl" over her shoulders, and smoking a cigarette. Perhaps not surprisingly, Wife "went ballistic" and began yelling numerous epithets at both Husband and the woman. Husband and the woman quickly left the marital residence together. They both went to the woman's apartment for the night.

On September 23, 2010, Husband filed the instant complaint in the Chancery Court of Dyer County, Tennessee, seeking a divorce on the ground of irreconcilable differences. Soon thereafter, Wife filed a counter-complaint for divorce, alleging irreconcilable differences, inappropriate marital conduct, and adultery. Husband later amended his divorce complaint to include as two alternative grounds set forth in Tennessee Code Annotated § 36-4-101(a)(10) ("habitual drunkenness or abuse of narcotic drugs") and Section 36-4-101(a)(11) ("cruel and inhuman treatment or conduct" that renders cohabitation unsafe). Initially, after the parties filed for divorce, Wife continued to live in the parties' marital residence pursuant to the parties' agreement.

---

[2]No children were born of the marriage.

[3]Wife described the negligee as a "pink thong bikini."

-2-

On December 10, 2010, Husband filed a contempt petition against Wife and a motion to have her removed from the marital home. Husband claimed, among other things, that Wife was removing and/or destroying his personal property in the marital residence. At some point after Husband filed his motion, Wife moved out of the marital residence and into an apartment. On January 6, 2011, the trial court entered a consent order, stating that both parties had vacated the marital residence, and that the property would be leased to two separate tenants, one in the main house and one in the "apartment" attached to the main house, for total rent of $1,100 per month. Husband was required to collect the rents and promptly pay the $1,107 monthly mortgage on the property. All other issues raised in Husband's motion were reserved for the final hearing.

On May 25, 2011, Husband filed an Affidavit of Property and Debts. As marital assets, Husband listed the marital home with a value of $150,000, a $47 balance in Husband's checking account, and monthly rental payments of $1,000 per month — $100 per month less than the rent noted in the above consent order. Husband's list of marital assets also included personal property and vehicles. In his affidavit, Husband noted that he receives $1,747.97 per month in military pension, and he proposed that Wife receive $278 per month as her share of the military pension. As marital debts, Husband listed the $116,000 remaining mortgage on the marital home and a $3,000 debt for new carpet in the marital home. He also listed a $6,119.47 debt to James Langley ("Mr. Langley"), the tenant occupying the main part of the marital residence, and a $1,900 debt to Husband's father, James Edwards. The affidavit indicated that Husband borrowed money from Mr. Langley and James Edwards in order to make the mortgage payments and avoid foreclosure. Husband's affidavit included proposals about the allocation of the parties' marital assets and debts.

On the same day, Husband filed an Affidavit of Income and Expenses. Husband calculated his monthly income to be $4,480.97, comprised of $1,747.97 from his military pension, $1,733.00 in wages from managing St. John Apartments, and $1,000 in rental income from the marital home. Husband's monthly expenses were listed as $4,316.00. Of that amount, $1,663 in expenses related to ownership of the marital home, including the mortgage payment, utilities, carpet, and repairs. As part of his monthly expenses, Husband included the $278 payment to Wife as her portion of his military pension, and $521 on the $6,119.47 debt to Mr. Langley. The remaining expenses were Husband's personal living expenses, such as rent, food, and clothing.

The divorce trial was held on May 26, 2011. The trial court heard testimony from Husband, Wife, and Suzanne Cole ("Ms. Cole"), the woman Wife found on the parties' couch in a pink negligee.

Husband testified at the outset of the trial. Husband said that he joined the military immediately after he graduated from high school. When he retired from the military, he and Wife moved to Florida. They purchased a home in Florida and Husband obtained a job there in the technology industry. By 2006, Husband had bought and sold two businesses. The sale of the second business, he said, generated $25,000 in proceeds, which was applied toward debts and the wedding of his daughter from a previous marriage. After that, Husband testified, he and Wife sold the house in Florida. Husband claimed that Wife realized between $75,000 and $80,000 on the sale of the parties' Florida home. After leaving Florida, the couple initially moved to Kentucky, but they later moved to Dyersburg, Tennessee. Once in Dyersburg, they purchased the marital residence at issue in the parties' divorce.

When Husband and Wife moved to Dyersburg, Husband took a job at a car dealership managing the dealership's body shop. By the time of trial, Husband testified, he was no longer working at the car dealership. Instead, Husband was working as the apartment manager for St. John Apartments, where he lived at the time of trial. In that position, Husband claimed, he earned $400 per week before taxes.

Husband said that Wife did not have a job when they moved to Dyersburg, but she eventually found a job as an adjunct professor at a college in Dyersburg. She also worked as a substitute teacher in the Dyer County School System. Husband estimated that Wife earned about $1,000 per month. Husband testified that Wife liked to stay up late at night and sleep until the afternoon, and implied that she declined jobs that interfered with this schedule.

Husband testified about the tenants in the marital home and the discharge of his responsibility for paying the mortgage on the home. He said that Mr. Langley was the tenant in the main part of the home, and that John Monroe was the tenant in the "apartment" attached to the main part of the home. Husband claimed that he received $500 per month in rent from each tenant, even though a copy of Mr. Langley's lease, which was admitted as an exhibit at trial, stated that Mr. Langley's rent was $600 per month. Husband acknowledged that he had been tasked with the responsibility for paying the mortgage on the marital home since he moved out in July 2010, but conceded that he had not always made the payments in a timely manner. In fact, Husband admitted that the mortgage was not paid in September, October, December 2010, or January 2011. In October 2010, Husband said, the mortgage holder notified him that it intended to foreclose on the home; by then, the mortgage payments were in arrears in the amount of $8,000. To "scrape up" the money needed to avoid foreclosure, Husband asserted, he purportedly borrowed $4,000 from Mr. Langley, his tenant, which he was repaying at a rate of $521 per month. Husband testified that he also sold his trailer to his father, James Edwards, for $1,400. By putting these monies together with other smaller loans from friends, Husband claimed, he was able to avert foreclosure on the marital home. Because the debt to Mr. Langley and the other debts were incurred for the purpose of

preserving the marital home, Husband said, those debts should be paid out of the proceeds from the sale of the home.

Husband testified that he served in the military from 1974 to 1998, and that he and Wife were married for seven of those 22 years. Based on this, he proposed that Wife should receive $278 per month of his $1,747.97 total monthly payment from his military pension.[4] In his testimony, Husband explained that, according to military regulations, a couple must have been married at least ten years before the military will divide the pension payment between the military member and the divorced spouse.[5] In light of these regulations, Husband proposed that the trial court simply award Wife $278 per month as her share of this marital property.

Husband asked the trial court to grant the divorce to him, because he and Wife had not been getting along for ten years prior to their separation. He claimed that, since the parties' separation, on some eight occasions, Wife had shown up at St. John Apartments and had been asked to leave. He conceded that both he and Wife used alcohol to excess, and that this contributed to their marital woes.

Husband flatly denied that he committed adultery during the parties' marriage. Husband acknowledged that he moved out of the marital residence as a result of the July 26, 2010 incident in which Wife came home to find Ms. Cole, she of the pink negligee, on the parties' couch smoking a cigarette. He described Ms. Cole as a "friend," and also said that she happened to be related to the tenant to whom Husband was indebted, Mr. Langley.[6] As it turned out, the pink negligee Ms. Cole was wearing on the night in question was purchased that same day at an adult superstore called "The Lion's Den." On cross-examination, counsel for Wife presented Husband with a receipt for the negligee, as well as sexual paraphernalia, for a total of $81.17, purchased that afternoon. Initially, Husband claimed that Ms. Cole purchased those items herself. Upon further questioning, however, he acknowledged that he had accompanied her to the store and had written a check for the items on the parties' joint

[4]The amount to which Husband stipulated was based on the fact that Wife was married to Husband for 31.8% of the time that he was on active duty, and 31.8% of his $1,747.97 monthly pension is $556. Husband reasoned that Wife should receive one half of this amount, or $278 per month.

[5]The parties did not dispute that, where there is a ten-year overlap in the spouse's active-duty military service and the marriage, the Department of Defense would send directly to each spouse their share of the pension benefits as provided in a valid court order.

[6]Husband testified that Mr. Langley is Ms. Cole's stepfather. As noted below, the trial court also heard testimony from both Ms. Cole and Mr. Langley; both of them testified that they are brother and sister. Husband did not explain the discrepancy.

checking account. Husband claimed, however, that Ms. Cole reimbursed him for that expense.

Husband testified that Ms. Cole lived in St. John Apartments, the apartment complex he was managing at the time of trial. He explained that Ms. Cole had previously lived in apartment C3 in that complex, but she moved into her mother's apartment in the same complex in September 2010, the same month that Husband filed the complaint for divorce. When Ms. Cole vacated apartment C3, Husband simply took over the lease and began living there in October 2010. Husband was asked about whether Ms. Cole spent the night at his apartment and about any trips he had taken with her; his interrogatory answers given in pretrial discovery had represented that no one had ever stayed overnight in Husband's apartment and did not reveal any trips with Ms. Cole. Contrary to Husband's sworn interrogatory answers, Husband conceded that Ms. Cole spent the night in his apartment once or twice each week, but he explained that she did so because she sometimes needed a break from her mother. Husband also admitted that he had gone on a hunting trip in Texas with Ms. Cole, and that Ms. Cole also accompanied him on two trips to Kentucky to visit his daughter from a previous relationship. Despite these admissions, Husband steadfastly denied any affair with Ms. Cole: "I'm not having an affair with [Ms. Cole]. Never have. . . . She's a friend."

Husband was asked on cross-examination about the loan from Mr. Langley that Husband had claimed was made to enable him to catch up the mortgage payments on the marital residence and avoid foreclosure. During Husband's cross-examination, a document was entered into evidence as Exhibit 4, written by Husband and dated February 23, 2011. The document appeared to be a written acknowledgment of debt from Husband to Mr. Langley in the amount of $6,119.47, with repayment to be made in monthly payments of $521 for 12 months. Husband said that the document granted Mr. Langley a lien on the marital residence and provided that if Husband did not "return the owed debt," Mr. Langley would "be authorized to take over and liquidate the collateral and return the proceeds to borrower . . . ." The document contains what purports to be the signatures of Mr. Langley and Husband.

Husband was also asked about a debt incurred for over $6,000 in dental work performed on Wife. He denied that Wife's dental work was required because he broke her tooth, maintaining that the dental work was done because Wife "had bad teeth. Always all of her life."

Wife called Mr. Langley to testify at trial. Mr. Langley said that he began renting the marital residence in January 2011, and that he paid Husband $500 per month in rent. Although the lease entered into evidence stated that his rent was $600 per month, Mr. Langley said that he had never paid Husband that amount of rent; Mr. Langley said that he did not read the lease. Shown Exhibit 4, the document written by Husband purportedly to memorialize the

$6,119.47 loan to Husband, Mr. Langley denied making Husband any such loan and denied that the signature on Exhibit 4 was his signature.[7] Mr. Langley said he was aware that there were threats to foreclose on the parties' marital residence; he said that at one point he gave Husband $600, but not as a loan. He testified that Husband "took [the $600] as rent." Mr. Langley said that Husband has never made a payment to him pursuant to Exhibit 4.

Mr. Langley testified that Ms. Cole is his sister. He acknowledged that their mother has an apartment in St. John Apartments but denied that Ms. Cole was living with their mother. He testified that, at the time of trial, Ms. Cole was living with Husband in his apartment, Apartment C3, and said that since she moved into the complex, he had never known her to live in a different apartment.

Ms. Cole also testified. She claimed that she had lived with her mother in the St. John Apartments since September 2010. She corroborated Husband's testimony that she and Husband were friends but were not romantically involved. Asked about the night Wife came home and found her at the parties' marital home, Ms. Cole explained that she had contacted Husband as her landlord because an ex-boyfriend whom she described as a stalker "had a knife to my throat and beat me up." Presumably to reassure Ms. Cole after the upsetting incident with the ex-boyfriend, Husband took Ms. Cole for a shopping spree at the adult superstore, where they purchased the pink negligee and other items, and then he brought her to the marital home.[8] When Wife came home from visiting her sister, Ms. Cole said, "All I was doing is sitting there" on the parties' couch in the marital home wearing the pink negligee. Ms. Cole complained: "[S]he come in – [Wife] come in, didn't ask no questions whatsoever, very violent, 'Bitch, whore, slut, prostitute,' all that. She didn't even know me." Ms. Cole acknowledged that she had accompanied Husband on three out-of-town trips. She understood that Mr. Langley had loaned Husband money, but she did not know the amount of the loan.

Wife also testified at trial. Her initial testimony was about financial matters. After the parties moved to Dyersburg, Wife said, she sought employment "[c]onstantly, for everything," and said that it was "rather difficult trying to find a job." At the time of trial, Wife was employed part-time as an adjunct college professor earning $12 per hour for about 20 hours per week. In addition, she worked as a substitute teacher in the Dyer County School

---

[7]Mr. Langley testified that he is a truck driver and has custody of two nieces and a nephew. When asked whether he had loaned Husband over $6,000, Mr. Langley commented: "If I had $6,000, I'd be in better shape than I am."

[8]Consistent with Husband's testimony, Ms. Cole testified that Husband paid for the items at the adult store, but she paid him back in cash.

system, earning $50 per day on the days she was asked to substitute. Wife estimated that she earned about $12,000 per year. Wife denied Husband's implication that she refused jobs because she liked to stay up late and sleep in; she said that she never turned down a substitute-teacher job that was offered, and that she "appl[ies] for every job that comes open."

While the parties were married, Wife stated, she was in charge of the parties' finances. She made all of the house payments on the marital residence through August 2010. In September 2010, after the parties separated, she claimed, Husband opened his own bank account and stopped putting money in their joint bank account. Thereafter, Wife made no more house payments. Wife acknowledged that Husband's September military pension payment was deposited into the joint account, and that this could have been used to make the September house payment. During the pendency of the divorce, Wife stated, Husband gave her only $500 and two bags of dog food.

Wife estimated that her expenses would be about $2,300 per month. She testified that she had to get $6,000 in dental work because Husband hit her on the head and broke her tooth in a confrontation. The dental surgery to repair the tooth cost about $6,500.

Wife explained that, at one point, she had a retirement account worth about $8,000. However, this account was cashed out to pay off a debt of Husband's business in Florida. When she and Husband sold their marital residence in Florida, Wife said, they received about $141,000 in equity. She said that about $37,000 of that money was used as a down payment on the Dyersburg marital residence, and the rest went to pay the parties' living expenses.

Wife testified about finding Ms. Cole at her home when she returned from visiting her sister on the night of July 26, 2010. That night, she said, when she came in the door, she first saw Husband in his pajama pants and then saw Ms. Cole sitting in her den in the pink negligee, smoking a cigarette. Before she could say anything, Wife said, Husband turned to Ms. Cole and said: "Suzanne, we haven't had sex here, have we?" In the ensuing conflagration, Wife said, Ms. Cole went into the bedroom to change out of the pink negligee, and Wife followed her into the bedroom. At that point, she said, she saw that Ms. Cole had brought an overnight bag to the parties' home. Husband and Ms. Cole quickly left the marital residence, but left behind the bag from the shopping trip to the adult superstore, "The Lion's Den." The bag contained unopened items that Husband and Ms. Cole had purchased that day, and elsewhere in the parties' home Wife found opened packages from other items they had purchased at the same store.[9] The day after this incident, Wife went to Ms. Cole's apartment. Husband answered the door naked, and Wife saw the infamous pink negligee behind him on the living

---

[9]One of the items Wife found opened was called "BJ Blast."

room floor of Ms. Cole's apartment. Wife's testimony completed the evidence presented to the trial court, and the case was taken under advisement.

On June 3, 2011, the trial court entered its findings of fact and conclusions of law. On the division of the marital property, the trial court noted that the parties had stipulated to the division of certain personal property, and that they had agreed to sell the marital home, pay off the mortgage and the debt for the carpeting, and divide the remaining proceeds equally. The trial court also noted that the parties had stipulated that Wife "was to receive $278.00 per month of [Husband's] pension."

As to the remaining issues, the trial court made specific factual findings based, in part, on its determination that Husband "was not truthful about several issues, and he had very little credibility." Regarding Husband's claimed $6,119.47 debt to Mr. Langley, the trial court noted Mr. Langley had denied the existence of this debt. The trial concluded that Exhibit 4 was "a document that [Husband] fabricated to deceive the Court." It further found that Husband had "engaged in inappropriate behavior with a woman with whom he has been living for the last 8 months." The trial court then addressed the parties' income and expenses. Prior to the sale of the marital residence, it found, Husband would have income of $4,202.97 per month (which did not include the $278 pension payment to Wife) and reasonable expenses of $3,238 per month. After the sale of the home, the trial court found, Husband would have an income of $3,202.97 per month and $1,650.00 of reasonable monthly expenses, giving him a monthly surplus of $1,552.97. The trial court found that Wife earned income of $1,278 per month, comprised of $1,000 per month from her jobs as an adjunct professor and substitute teacher, plus $278 from her share of Husband's military pension. It determined that Wife had $2,200 of reasonable monthly expenses, leaving a deficiency of $922 per month.

The trial court then granted Wife a divorce based on Husband's adultery. It assigned most of the marital debt to Husband, including the $6,400 debt for Wife's dental work. The trial court determined that Wife was economically disadvantaged as compared to Husband and held that an award of alimony was appropriate. While rehabilitation was not possible, the trial court found that Wife needed "assistance adjusting to the economic circumstances of divorce and long term support." On this basis, the trial court awarded Wife transitional alimony of $250 per month for a period of 36 months, as well as alimony *in futuro* of $750 per month. The trial court specifically found that Husband "has the ability to pay alimony in these amounts." Wife's request for attorney fees was denied.[10] On July 12, 2011, the trial

---

[10]On June 9, 2011, the trial court filed amended findings of fact and conclusions of law, but the amendment did not relate to the issues raised on appeal.

court entered the final decree of divorce, attaching a copy of the previously-filed findings of fact and conclusions of law and incorporating them by reference.

On August 11, 2011, Husband filed a motion to alter or amend the final decree, pursuant to Rule 59.04 of the Tennessee Rules of Civil Procedure. In the motion, Husband argued that the proof was insufficient for the trial court to grant Wife a divorce on the basis of adultery. He asked the trial court to alter or amend the alimony award on numerous bases, including an argument that "alimony *in futuro* should be awarded only when the trial court finds that rehabilitation is not feasible and long-term support is necessary." Husband also contended that the trial court erred by awarding Wife income from his military pension "when she had not been married to him for the requisite length of time while he was in active duty with the United States military."

Wife's response to Husband's motion, filed on August 18, 2011, stated that Husband had not alleged a basis for Rule 59.04 relief. She acknowledged that Husband was "correct in stating the Court cannot order a division of [Husband's] military retirement benefits unless all prerequisites are met including the overlap of the marriage and active duty for a certain number of years." Nevertheless, Wife asserted, Husband in this case stipulated for her to receive the monthly payment of $278 out of his retirement benefits as part of the equitable division of marital property. She argued that, although the trial court might not have had the authority to order Husband to divide the military retirement benefits in this manner, "the Court can approve the stipulation of the parties that [Husband] will pay $278.00 per month from those funds once he has received them to [Wife] as marital property."

On the same date, Wife filed a petition for contempt and for damages for intentional infliction of emotional distress. The petition asserted that, since the entry of the final decree of divorce, Husband had willfully failed to make alimony payments to her and had willfully failed to pay other debts the trial court had ordered him to pay, including the mortgage on the marital residence. She claimed that Husband failed to make the required payments on June 1, July 1, and August 1, 2011, and that each failure to pay constituted a separate criminal and/or civil contempt of court.

On September 1, 2011, the trial court conducted a hearing on Husband's motion to alter or amend as well as Wife's petition for contempt and emotional distress damages. At the hearing, Husband submitted no additional proof to support his motion to alter or amend. He argued, however, that under Tennessee law he did not have the power to stipulate to the division of his military pension benefits. He also insisted that the evidence was insufficient to find that he committed adultery, because Husband had not admitted that he had done so. In addition, Husband argued that the trial court had erred in awarding alimony because

Wife's educational background gave her the greater earning power. In any event, he argued, Wife could be rehabilitated and was therefore not entitled to alimony *in futuro*.

At the conclusion of the hearing, the trial court addressed Husband's motion to alter or amend. The trial court declined to modify any of its factual findings because they were based in large part on the determination that Husband's testimony was not credible. The trial judge stated: "[N]ot only did [Husband] lie, he fabricated a document to deceive the Court, and probably I should have contacted the district attorney because he committed perjury." However, based on the applicable military regulations, the trial court concluded that Husband's military pension was his separate property, and that he did not stipulate to its division with Wife. In light of this, the trial court increased the amount of the award of alimony *in futuro* by $278 per month. On September 9, 2011, the trial court entered a written order consistent with its oral ruling. The findings of fact were modified to reflect that Husband's income after the sale of the marital home would be $3,480.97 per month, and that Wife was in need of alimony *in futuro* in the amount of $1,028 per month, which equaled the original $750 per month plus the $278 per month from Husband's military pension. The trial court denied Husband's motion to alter or amend in all other respects.

On October 14, 2011, the trial court entered an order on Wife's petition for contempt and her claim for damages based on intentional infliction of emotional distress. The trial court found that Husband was in willful violation of its previous order as alleged by Wife, but it determined that Wife had failed to prove that she was entitled to damages for intentional infliction of emotional distress. Husband filed this timely appeal.

### ISSUE ON APPEAL AND STANDARD OF REVIEW

The sole issue raised by Husband in this appeal is whether the trial court abused its discretion in awarding transitional alimony and alimony *in futuro* to Wife.

On appeal, a trial court's findings of fact are reviewed *de novo* on the record, with a presumption that they are correct unless the evidence preponderates otherwise. ***Jones v. Jones***, 784 S.W.2d 349, 352 (Tenn. Ct. App. 1989). We give great weight to factual findings that were based on witness credibility, and the trial judge's assessment of witness credibility will not be reversed absent clear and convincing evidence to the contrary. ***Sullivan v. Sullivan***, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). Questions of law are reviewed *de novo*, with no presumption of correctness in the trial court's conclusions of law. ***Jordan v. Knox County***, 213 S.W.3d 751, 763 (Tenn. 2007).

Trial courts "have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of such an award." ***Gonsewski v. Gonsewski***, 350

S.W.3d 99, 105 (Tenn. 2011). In *Gonsewski,* the Court emphasized that a trial court's decision on spousal support is factually driven, so appellate courts are not inclined to second-guess such an award. Rather, we must determine whether the trial court abused its discretion in making the award. A trial court abuses its discretion when it "causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.* "If the discretionary decision is within a range of acceptable alternatives, appellate courts will not substitute their decision for that of the trial court simply because the appellate court would have chosen a different alternative." *Sullivan*, 107 S.W.3d at 510.

In considering the type and amount of alimony to be awarded, a trial court is required to balance several factors, including those enumerated in Tennessee Code Annotated § 36-5-121(i):

> (i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3) The duration of the marriage;
>
> (4) The age and mental condition of each party;
>
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (Supp. 2012). In fashioning an award of spousal support, the primary considerations are the recipient spouse's need and the obligor spouse's ability to pay. ***Burlew v. Burlew***, 40 S.W.3d 465, 472 (Tenn. 2001).

## ANALYSIS

Husband challenges virtually every aspect of the trial court's alimony award, arguing that "the instant case is not a proper case under Tennessee law for an award of alimony." Husband argues that the preponderance of the evidence showed that Wife was underemployed and was "capable of earning much more than him." He also argues that the preponderance of the evidence established that Wife could have been rehabilitated, making an award of alimony *in futuro* inappropriate.[11] Husband claims that the trial court's finding that he would be more capable than Wife of acquiring capital assets and income in the future was illogical under this record. Husband also argues that his military pension was his separate property, and that the trial court "circumvented the law by placing the exact amount earlier awarded to [Wife] from the pension into an increased amount of long-term or life-time alimony as it exists here." He insists that the preponderance of the evidence does not support the trial court's finding that he was guilty of abuse and adultery. In light of these errors, and

---

[11] Although Husband argues that Wife was capable of being rehabilitated, he does not concede that she should have been awarded rehabilitative alimony.

with a proper balancing of the factors in Section 36-5-121(i), Husband argues, it is clear that the trial court reached an unreasonable conclusion and, therefore, abused its discretion in its award of alimony to Wife. Alternatively, he argues, if an alimony award were appropriate, it should be reduced in amount and required on a short-term basis only.

We observe at the outset that many of the trial court's findings on disputed issues of fact were resolved in favor of Wife based on its assessment of the parties' credibility. The trial court found that Husband had fabricated documents and even went so far as to find that Husband had perjured himself, concluding that Husband "had very little credibility." From our review of the record, the evidence overwhelmingly supports the trial court's credibility determination in favor of Wife.

Giving due deference to the trial court's credibility determinations, the evidence clearly preponderates in favor of all of the trial court's factual findings. Husband argues first that Wife was underemployed, but cites no proof in the record to support his bare assertion. Specifically, Husband submitted no proof of other jobs that were available to Wife, much less any proof that she willfully refused such other jobs. Likewise, Husband submitted no evidence that Wife could be rehabilitated by seeking further education or training to increase her earning power; she already has both a bachelor's degree and a master's degree. *See* Tenn. Code Ann. § 36-5-121(e)(1). The evidence in the record fully supports the trial court's finding that Husband is more capable than Wife of acquiring capital assets and income in the future. Husband received both experience and training while in the military, and he also has experience as an entrepreneur. His military service enables him to continue to seek work while receiving his military pension. In contrast, Wife is nearing retirement age with neither retirement funds nor the earning ability possessed by Husband.

Finally, Husband argues that the evidence does not support the trial court's finding that he committed adultery, because Wife submitted "no proof of sexual relations." This argument verges on the preposterous. The record need not include DNA evidence to support the trial court's finding of adultery by Husband. Therefore, we reject all of Husband's challenges to the trial court's factual findings.

Many of the factors upon which the trial court based its alimony award were undisputed. According to Husband's own Affidavit of Income and Expenses, after the sale of the marital residence, Husband will have $3,480.97 in monthly income.[12] The trial court determined that

_____

[12]Husband argues on appeal that the trial court erred in denying his motion to alter or amend the alimony award based on evidence that he was "laid off" from his job as apartment manager. However, Husband did not argue in his motion to alter or amend that the alimony award should be modified on this basis. Rather,
(continued...)

his reasonable expenses would be $1,650, giving him a surplus of $1,830.97. Wife, on the other hand, earned $1,000 per month, but had $2,200 in reasonable expenses, for a deficit of $1,200. The evidence in the record supports the trial court's finding that Husband would be able to pay $1,278 to Wife for three years to cover her deficit until she gets closer to becoming eligible to draw full social security benefits. After the three years of transitional alimony, Husband will be required to pay only $1,028 per month, leaving him an $800 surplus each month.

Husband argues strenuously that the trial court erred in its decision to add $278 to the alimony *in futuro* award after it became clear that Wife could not receive any of Husband's military pension directly from the Department of Defense. We note that Husband testified at trial that Wife "should receive about $278 per month as her marital share of [his] pension." We find no error in the trial court's decision to increase the original alimony award by $278 per month.

Under all of these circumstances, we conclude that the trial court's alimony award to Wife was within the range of acceptable alternatives. Accordingly, we find no abuse of the trial court's discretion.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are taxed to Appellant George Edwards and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[12](...continued)
evidence that Husband lost his job was presented in support of Husband's argument that he was not in willful contempt of the trial court's orders. Therefore, because the argument he now raises on appeal was not raised in the trial court below, we deem it to be waived. ***Fayne v. Vincent***, 301 S.W.3d 162, 171 (Tenn. 2009).